UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

MAUREEN A. HUPPE, derivatively on behalf
of WPCS International Inc.,

       Plaintiff,

   -v-

SPECIAL SITUATIONS FUND III QP, L.P.,
SPECIAL SITUATIONS PRIVATE EQUITY
FUND, L.P.,

       Defendants,

and WPCS INTERNATIONAL INC.,

       Nominal Defendant.

--------------------------------------------------------x

<u>**FOR PUBLICATION**</u>

No. 06 Civ. 6097 (LTS)(FM)

## OPINION

APPEARANCES:

| | |
|---|---|
| LAW OFFICE OF DAVID LOPEZ<br>  By: David Lopez, Esq.<br>171 Edge of Woods Road, PO Box 323<br>Southampton, NY 11968 | LOWENSTEIN SANDLER PC<br>  By: Lawrence M. Rolnick, Esq.<br>      Thomas E. Redburn, Jr., Esq.<br>65 Livingston Avenue<br>Roseland, NJ 07068 |
| LAW OFFICES OF DANIEL E. DOHERTY<br>  By: Daniel Eugene Doherty, Esq.<br>8500 College Blvd, Suite 113<br>Overland Park, KS 66210 | *Attorneys for Defendants* |
| *Attorneys for Plaintiff* | |

Pursuant to Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b) ("the Act"), Plaintiff Maureen A. Huppe ("Plaintiff") brings this derivative action on behalf of nominal defendant WPCS International Incorporated ("WPCS"), seeking disgorgement of "short-swing" profits from Defendants Special Situations Fund III, QP, L.P. ("QP"), and Special Situations Private Equity Fund, L.P. ("PE") (collectively, "Defendants").  Plaintiff now moves for summary judgment in her favor, seeking full disgorgement of the profits earned from the short-swing trades at issue, and Defendants have responded with their own cross-motion for summary judgment.

The Court has jurisdiction pursuant to 15 U.S.C. § 78aa.  The Court has considered thoroughly the parties' submissions in connection with both motions.[1]  For the reasons that follow, Plaintiff's motion for summary judgment in her favor is granted.  For the same reasons, Defendants' cross-motion is denied.

BACKGROUND

The following facts pertinent to the summary judgment motions are undisputed unless otherwise noted.  The shares of WPCS common stock at issue in this case have been registered pursuant to Section 12(g) of the Act at all relevant times.  (Stipulations (hereinafter "Stip") No. 1.)  PE and QP are Delaware limited partnerships, and each owned over ten percent of the total number of WPCS common stock shares outstanding at all relevant times.  (Stip Nos. 3-5,

---

[1] Defendants' opposition to Plaintiff's motion for summary judgment (Docket Entry No. 43) includes a motion to strike Exhibit C appended to Plaintiff's Rule 56.1 Statement (Docket Entry No. 38), which consists of a chart purportedly representing Defendants' organizational structures.  Because the Court's decision does not rely on Exhibit C, Defendants' motion to strike is denied as moot.

10; Defs.' 56.1 Stmt. ¶ 11.)

PE's and QP's respective limited partnership agreements contained identical language providing that the general partner of each limited partnership would have all the powers and rights of general partners under Delaware partnership law, and that they would have the power to invest or reinvest any or all of the limited partnership's assets. (See Stips. at A-15; B-14.) The agreements further provided the general partners with the authority to appoint agents to perform the general partner's duties on behalf of the limited partnership. (See id.) The power to make investment and voting decisions for both PE and QP with respect to their holdings in WPCS stock was entrusted to Austin W. Marxe ("Marxe") and David M. Greenhouse ("Greenhouse") at all relevant times. (Marxe Decl. dated Oct. 5, 2007, ¶ 2.)

Between December 15, 2005 and January 30, 2006, PE sold a total of 79,320 shares of WPCS common stock, at prices ranging from about $9.18 to $12.60, for a total of $555,240. (Stips No. 13.) On January 11, 2006, QP sold 3,500 shares at about $12.15 per share, and on January 26, QP sold 29,500 shares at about $12.42 per share, for a combined total of $409,049.25. (Stips Nos. 11, 12.)

In March of 2006, WPCS publicly announced that it would have to restate its earnings for three quarters of 2005, because WPCS concluded, based on new interpretations issued by the Financial Accounting Standards Board, that it had been interpreting certain accounting standards incorrectly. (Marxe Decl. ¶ 6; Ex. 12 of Decl. of Thomas E. Redburn, dated Oct. 5, 2007, at 3.) Neither Marxe nor Greenhouse was aware of this issue until WPCS made its public announcement. (Marxe Decl. ¶ 6; Pl.'s Reply to Defs.' 56.1 Stmt. ¶ 12.) WPCS had originally planned a secondary public offering of its securities in early 2006 in order to raise the capital necessary to pursue certain time-sensitive strategic goals, but that plan was no longer feasible given

the falling prices of WPCS stock resulting from the unexpected earnings restatement announcement. (Marxe Decl. ¶ 7; Pl.'s Reply to Defs.' 56.1 Stmt. ¶ 12.) As a result, WPCS approached Marxe and Greenhouse and asked that QP and PE provide WPCS additional financing by purchasing WPCS stock. Believing that this additional investment would help WPCS achieve its strategic goals, thereby protecting any remaining investments in WPCS, Marxe and Greenhouse agreed to pay cash in exchange for shares of WPCS stock "on behalf of QP and PE." (Marxe Decl. ¶ 7; Pl.'s Reply to Defs.' 56.1 Stmt. ¶¶ 13-16.) Defendants assert that Marxe and Greenhouse entered into these agreements on the basis of arms-length negotiations, and that they did not have access to, and did not receive, any non-public information in the course of the negotiations. (Marxe Decl. ¶ 7; Pl.'s Reply to Defs.' 56.1 Stmt. ¶ 16.)

On April 11, 2006, pursuant to the aforementioned discussions between WPCS and Marxe and Greenhouse, PE purchased 289,388 shares of WPCS common stock at the below-market price of $7 per share, and QP purchased 377,080 shares of WPCS common stock at the same price. (Stip Nos. 13, 14.) After these transactions, WPCS was able to meet its strategic goals, and WPCS's share price began to improve. (Marxe Decl. ¶ 7; Pl.'s Reply to Defs.' 56.1 Stmt. ¶ 17.)

DISCUSSION

Summary judgment shall be granted in favor of a moving party where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In the summary judgment context, a fact is material "if it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Holtz v.

Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (alteration in original)). On cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Schwabenbauer v. Bd. of Educ. of Olean, 667 F.2d 305, 314 (2d Cir. 1981).

Section 16(b) of the Act requires insiders (beneficial owners, directors, and officers) to disgorge profits earned in short-swing trading:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner . . . in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months.

15 U.S.C.A. § 78p(b) (West 1997). Only beneficial owners of "more than 10 per centum of any class of any equity security . . . which is registered" qualify as "beneficial owners" within the meaning of this statute. Id. at § 78p(a). As the Second Circuit has summarized,

> liability under Section 16(b) does not attach unless the plaintiff proves that there was (1) a purchase and (2) a sale of securities (3) by an officer or director of the issuer or by a shareholder who owns more than ten percent of any one class of the issuer's securities (4) within a six-month period.

Gwozdzinsky v. Zell/Chilmark Fund, L.P., 156 F.3d 305, 308 (2d Cir. 1998).

Defendants argue that, as a matter of law, they cannot be held liable under Section

16(b) because: (1) PE and QP were not "beneficial owners" under Section 16(b); and (2) PE's and QP's exchange of cash for shares of WPCS stock on April 11, 2006, were not "purchases" for purposes of Section 16(b). The Court addresses these arguments in turn.

*Defendants were "beneficial owners" of more than ten percent of issuer's securities*

Defendants argue that they were not "beneficial owners" under Section 16(b), and therefore cannot be held liable under that section. "Beneficial owner" is not defined in the Act, but has been defined in regulations promulgated by the SEC:

> Solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered pursuant to section 12 of the Act, the term "beneficial owner" shall mean any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
> (1) Voting power which includes the power to vote, or to direct the voting of such security; and/or,
> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. 240.13d-3(a)(1).[2] Such beneficial owners who conduct short-swing trades are liable under Section 16(b), but the <u>extent</u> of their liability, that is, how much of the short-swing profit they must disgorge, is governed by the following definition of "beneficial owner" further provided for in the regulations:

> Other than for purposes of determining whether a person is a beneficial owner of more than ten percent . . . , the term beneficial owner shall mean any person who, directly or indirectly . . . has or shares a direct or indirect pecuniary interest in the

---

[2] 17 C.F.R. 240.16a-1(a), which applies "solely to section 16 of the Act," provides: "Solely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities registered . . . , the term 'beneficial owner' shall mean any person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder . . .". 17 C.F.R. 240.13d-3, cited here, is promulgated under Section 13(d) of the Act.

> equity securities . . . The term pecuniary interest . . . shall mean the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities.

17 C.F.R. 240.16a-1(a)(2); see Feder v. Frost, 220 F.3d 29, 32-34 (2d Cir. 2000) (discussing dual definitions of "beneficial owner" and their respective purposes).

Defendants focus solely on the first definition. According to Defendants' theory, because Marxe and Greenhouse possessed exclusive voting and investment power with respect to the WPCS securities purchased and sold by PE and QP, PE and QP themselves had no power whatsoever to invest or vote their own holdings of WPCS stock and therefore were not "beneficial owners" of over ten percent of the WPCS securities class at issue.

Defendants' proposition is unsupported by citations to any authority and fails as a matter of law and logic. As limited partnerships that owned WPCS stock, PE and QP as partnership entities had the power to exercise control over their assets. Under their respective partnership agreements, this control was exercised on their behalf by the respective general partners and/or persons (such as Marxe and Greenhouse) who were designated by the general partners to exercise control over Defendants' property. Nothing in the delegation to Marxe and Greenhouse of power to invest and vote Defendants' shares on Defendants' behalf made the exercise of that power anything less than an exercise of power by Defendants. Marxe and Greenhouse in fact made investment decisions on Defendants' behalf, and their actions bound Defendants; their Section 16(b) liability arguments ignore these basic principles of partnership and agency law. See Revised Unif. P'ship Act § 103(a) ("relations among the partners and between the partners and the partnership are governed by the partnership agreement"); id. § 301 ("Each partner is an agent of the partnership for the purpose of its business. An act of a partner . . . for apparently carrying on in the ordinary course the partnership business . . . binds the partnership"); Fisher v. Townsends, Inc., 695

A.2d 53, 57 (Del. 1997) ("An agency relationship is created where one party consents to have another act on his behalf, with the principal controlling and directing the acts of the agent.") (internal quotations and citations omitted); see also Peter J. Romeo and Alan L. Dye, Section 16 Treatise and Reporting Guide 134 (§ 2.03[5][f]) (3d ed. 2008) ("The fact that only natural persons can make voting and investment decisions for the entity does not mean that the entity itself is not a beneficial owner."). PE and QP thus, through their designated agents, exercised direct control over the voting and investment of their assets, including the WPCS stock, within the meaning of 17 C.F.R. § 240.13d-3(a)(1).

The Court has considered thoroughly all of Defendants' remaining arguments as to why they should not be considered "beneficial owners" of WPCS stock under Section 16(b) and finds them to be without merit. Because Defendants PE and QP directly had the power to vote or invest WPCS shares through their agents Marxe and Greenhouse, or in the very least indirectly had such power through the agents designated by Defendants' respective general partners, the Court holds that PE and QP were "beneficial owners" of more than ten percent of a class of WPCS equity securities, and were therefore statutory insiders under Section 16(b), at all relevant times.

*The April 11, 2006 transactions constituted "purchases"*

Defendants also argue that they are not liable under Section 16(b) for the transactions at issue because, while the December 2005 and January 2006 sales of WPCS stock were undisputedly "sales" under Section 16(b), the April 2006 transactions were unorthodox transactions that should be considered exempt from the typical definition of "purchases."[3] In

---

[3] The Court notes, and Defendants do not seriously contest, that PE's and QP's exchanges of cash for stock constitute "purchases" under the plain meaning of the

support of their argument that the transactions at issue differ greatly from the "paradigmatic abusive sale/purchase sequence that Section 16(b) was intended to prevent" (Defs.' Br. at 19), Defendants note that WPCS itself initiated the April 2006 transactions, that WPCS did so because it needed cash to escape its own dire financial straits, and that the cash infusions provided by PE and QP materially aided WPCS in turning itself around.

As legal support, Defendants rely solely on the Supreme Court's decision in <u>Kern Cty. Land Co. v. Occidental Petroleum Corp.</u>, 411 U.S. 582 (1973) and its progeny, and argue that, just as the Supreme Court exempted the transaction in <u>Kern</u> from the definition of "sale" under Section 16(b), this Court should exempt the April 2006 transactions in this case from the definition of "purchases" under Section 16(b). However, the Court is unpersuaded that the Supreme Court's reasoning in <u>Kern</u> points toward the propriety of a similar treatment of the limited partnerships' April 2006 transactions in WPCS stock. In <u>Kern</u>, the Supreme Court considered the question of whether, within six months of an undisputed purchase of shares by a greater than ten percent beneficial owner attempting a hostile takeover of the issuing company, that insider's subsequent sale of shares pursuant to a defensive merger undertaken by the issuer constituted a "sale" for Section 16(b) purposes. The Supreme Court held that it should not, because the beneficial owner's antagonistic relationship with the issuer precluded any possibility that it would have access to inside information, and because the "sale" at issue was wholly involuntary. <u>See</u> <u>Kern</u>, 411 U.S. at 600 ("the involuntary nature of Occidental's exchange, when coupled with the absence of the possibility of speculative abuse of inside information, convinces us that s 16(b) should not apply to transactions such as this one"). The Second Circuit has interpreted <u>Kern</u> to apply only when the unique factors

---

term. The Act defines "purchase" as including "any contract to buy, purchase, or otherwise acquire" a security. 15 U.S.C.A. § 78c(a)(13) (West Supp. 2008).

attending the defensive merger context are present. See Am. Standard, Inc. v. Crane Co., 510 F.2d 1043, 1053 (2d Cir. 1974) ("We believe that Kern County holds the defensive merger situation to be sui generis in terms of § 16(b) liability"); Heublein, Inc. v. Gen. Cinema Corp., 722 F.2d 29, 31 (2d Cir. 1983) (noting that the district court "accurately state[d] and applie[d]" both Kern and Am. Standard, and summarizing the district court's reading of Kern and Am. Standard as being based on the factors of hostility, involuntariness, and the lack of any likelihood of access to material inside information); At Home Corp. v. Cox Commc'ns, Inc., 446 F.3d 403, 408 (2d Cir. 2006) ("This Circuit has suggested that these factors-an involuntary transaction by an insider having no access to inside information-are prerequisites to use of the Kern County analysis") (citing Am. Standard); see also Colan v. Mesa Petroleum Co., 951 F.2d 1512, 1523 (9th Cir. 1991) ("The cases that have applied the Kern County 'unorthodox transaction' defense to a short-swing sale by a beneficial owner have characterized it as a narrow exception to section 16(b)").

There are no proffered facts in this case that suggest in any way that PE's or QP's purchases of WPCS shares on April 11 were hostile or involuntary; on the contrary, the undisputed facts show that Defendants' decision to purchase was entirely volitional. Furthermore, there are no facts suggesting the existence of any antagonistic relationship between Defendants and WPCS that would have precluded the possibility of inside information access by virtue of Defendants' greater than ten percent ownership. Therefore, the potential for abuse that Section 16(b) is intended to guard against was clearly present. See Roth v. Jennings, 489 F.3d 499, 507 (2d Cir. 2007) ("Congress sought to curb the evils of insider trading by taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great") (quoting Foremost-McKesson, Inc. v. Provident Secs. Co., 423 U.S. 232, 243 (1976) (quotations omitted).

Nor is Defendants' allusion to the Second Circuit's decision in At Home Corp. v.

Cox Commc'ns, Inc., 446 F.3d 403 (2d Cir. 2006), helpful to their position. That case involved the acquisition of beneficial ownership that was incidental to a much larger transaction in which third party companies that held the subject securities in their portfolios were acquired at a cost over twenty times the value of the subject securities. See id. at 409-10 ("section 16(b) generally does not take account of transactions in which an insider's acquisition of an enterprise holding the issuer's stock entails appreciable risks and opportunities independent of the risks and opportunities that inhere in the stock of the issuer."). Here, the undisputed facts demonstrate that the April 2006 transactions involved nothing more than the exchange of cash for stock. Therefore, the holding of At Home does not support an exemption for Defendants' exchanges of their cash for WPCS stock from the plain meaning of the term "purchases" under Section 16(b).

Having failed to demonstrate that an exemption is warranted under any existing case law, Defendants emphasize the purportedly unique nature of their transactions and their proffers that Defendants did not act on the basis of inside information and actually benefitted WPCS. Although it is undisputed in this case that WPCS genuinely needed and was provided capital through PE's and QP's purchases of WPCS stock, nothing in the statute permits the Court to consider as a mitigating factor the issuer's intent or any benefit inuring to the issuer, nor is there any equitable defense available based on such theories. See Donoghue v. Natural Microsystems Corp., 198 F. Supp. 2d 487, 491 (S.D.N.Y. 2002) ("equitable defenses have been rejected in this Circuit even where the issuer participated in the transaction and where a transaction occurred at the incentive of the issuer"); Roth v. Fund of Funds, Ltd., 405 F.2d 421, 422-23 (2d Cir. 1968) ("the statute makes no exception where the transaction giving rise to the profit occurred at the incentive of the issuer, and we are not disposed to create one"); Magida v. Continental Can Co., 231 F.2d 843, 846 (2d Cir. 1956) (no exemption from Section 16(b) warranted even where the sale at issue

"was made at the specific instance and request" of the issuer, "was in [the issuer's] best interest and that of its stockholders, and was made pursuant to a plan conceived, developed, promoted, and consummated by" the issuer.); Feder, 220 F.3d at 32 ("no showing of actual misuse of inside information or of unlawful intent is necessary to compel disgorgement.") (quoting Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 320 (2d Cir. 1998)).

The Court has considered thoroughly Defendants' remaining arguments for exempting the April 2006 transactions from Section 16(b) liability and finds them to be without merit. For these reasons, the Court holds that the April 2006 transactions constituted "purchases" as a matter of law under Section 16(b).

*Defendants are liable under Section 16(b) for their short swing profits*

Defendants PE and QP, who were beneficial owners of over ten percent of a class of registered WPCS stock, sold shares of WPCS common stock in December 2005 and January 2006 and purchased shares of WPCS common stock in April 2006. Because the sales and purchases occurred within a six-month period, Defendants are required to disgorge their profits earned from these transactions.

Profits are calculated for Section 16(b) purposes using the "Lowest-In, Highest-Out" method, "arbitrarily matching [the] highest-priced sales transactions with the lowest-priced purchases containing the same number of shares." Donoghue, 198 F. Supp. 2d at 492 (citing Gratz v. Claughton, 187 F.2d 46, 52 (2d Cir. 1951)); see also Donoghue v. Casual Male Retail Group, Inc., 375 F. Supp. 2d 226, 237 (S.D.N.Y. 2005) ("The computation itself involves subtracting the purchase price of the securities from the proceeds of the sale. This must be done in such a way as to increase the recoverable profits to the greatest possible amount") (citations and quotations

omitted); Feder v. Martin Marietta Corp., 406 F.2d 260, 269 (2d Cir. 1969) ("Under the w[e]ll-established rule, profits for § 16(b) purposes are computed by arbitrarily matching purchases with sales in order to obtain the maximum amount of profits.").

It is undisputed that PE sold a total of 79,320 shares between December 2005 and January 2006 for a total of $863,872.51.[4] PE then purchased 79,320 shares in April 2006 at $7 per share, for a total of $555,240. The resulting profit for which PE is liable is therefore $308,632.51.

It is equally undisputed that QP sold a total of 33,000 shares in January 2006 for a total of $409,049.25. QP then purchased 33,000 shares in April 2006 at $7 per share, for a total of $231,000. The resulting profit for which QP is liable is therefore $178,049.25.

Plaintiff's request for prejudgment interest, however, is denied, because WPCS undisputedly solicited the purchases at issue and there is no evidence of bad faith. See Morales v. Freund, 163 F.3d 763, 767 (2d Cir. 1999) ("Prejudgment interest is generally awarded as part of § 16(b) recoveries, but the question of whether such interest should be given in a particular case is within the discretion of the trial court").

In June 2006, prior to the initiation of this lawsuit but after Plaintiff's attorney expressed concerns about the alleged short-swing trading, Marxe and Greenhouse agreed to disgorge $31,948.45 to WPCS in June 2006, which represented an as yet unexplained calculation of their respective personal interests in the short-swing profits for which Defendants are liable. The record is not clear as to whether this amount was ultimately transferred to WPCS. (See Marxe Decl. ¶ 9; Decl. of Daniel E. Doherty dated Oct. 5, 2007, ¶ 6; id. at B-22.) Therefore, the Court directs the parties to

---

[4] The total was computed by multiplying the number of shares sold by the price per share on that date, then adding all the transactions together. (See Stips No. 13 for the schedule of sales.)

consult with each other in accordance with the following instructions for the purpose of finalizing a judgment amount.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment in her favor is granted, and Defendants' cross-motion is denied. The parties are directed to consult with one another and, **no later than July 31, 2008**, to submit to the Court jointly a proposed judgment accurately reflecting any appropriate offset for the prepayment by Marxe and Greenhouse that may have been made. If the parties are unable to agree on a joint proposal for a judgment, each party shall, by that date, submit its respective proposal, together with an explanatory letter establishing the basis of the proposed judgment amount.

The Clerk of Court is respectfully requested to terminate Docket Entries Nos. 35 and 39.

SO ORDERED.

Dated: New York, New York
July 3, 2008

LAURA TAYLOR SWAIN
United States District Judge